[No. 29045. Department Two. June 28, 1943.]

JOHN T. DALTON, *Appellant*, v. CASPAR W. CLARKE
et al., *Respondents*.[1]

[1]Reported in 139 P. (2d) 291.

*Caldwell, Lycette & Diamond,* for appellant.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondents Clarke *et al.*

*Holman, Sprague & Allen* and *Emory E. Hess,* for respondent The Austin Company. ·

GRADY, J.—This action was brought by John T. Dalton, a resident taxpayer of Seattle, against the members of the transportation commission of that city, the municipality, a number of its officials, and The Austin Company, a corporation, to test the validity of a contract entered into between the city, acting by its transportation commission, and The Austin Company for the construction of an addition to the north Seattle terminal station of the city's transit system to provide housing facilities for transportation equipment. The theory advanced by the complaint is that the contract has been awarded on a cost-plus basis with a guaranteed maximum, and that neither the board of public works nor the transportation commission called for bids for the construction of the improvement, and, therefore, such a contract is illegal according to the statutes of Washington and the charter of the city.

Upon the filing of the complaint, a show cause order was issued by the court. On the return day, the defendants appeared and answered the complaint. An

agreed statement of facts was filed and presented to the court, and, after hearing argument of counsel, the trial judge rendered his decision to the effect that the plaintiff, as a private citizen, could not maintain such an action as he had brought for the reason that he had not shown by pleading or proof that he had any interest in the subject matter of the action different from any other member of the general public, nor would he suffer any damage as a taxpayer; also, the transportation commission had the power and authority to enter into the contract for the construction of the improvement without calling for bids thereon. A judgment was entered dismissing the action, from which the plaintiff has taken this appeal.

Seattle is a city of the first class, having a population of more than three hundred thousand, and it operates pursuant to the statutes of Washington, relating to such cities, and a charter. The city acquired, and operates, a transportation system. Prior to the passage and taking effect of chapter 47, Laws of 1939, p. 142 (Rem. Rev. Stat. (Sup.), § 9488-6 [P. C. § 1238-5] *et seq.*), the transportation system seems to have been managed and operated by and under the direction of its board of public works.

Art. VIII, § 14, of the city charter provides:

"All *public improvements* to be made or supplies to be purchased by contract shall be let to the lowest bidder therefor; . . . Before awarding any such contract the board of public works shall cause to be published in the official newspaper of the city a notice for at least ten (10) days before the letting of such contract, inviting sealed proposals for such work. . . ." (Italics ours.)

Art. IX, § 19, provides:

"The purchasing agent shall make all purchases of supplies, materials and equipment, in the manner provided by ordinance, for all departments and agencies of the city government including the park and library departments. . . .

"Before making any purchase or sale, the purchasing agent shall be required to secure bids under such rules and regulations and subject to such exceptions as the council may by ordinance prescribe.

"All expenditures for supplies, materials or equipment involving more than One Thousand Dollars ($1,000) shall be made on written contract. All such contracts shall be awarded to the lowest and best bidder, after public advertisement as may be prescribed by ordinance."

Chapter 47 of the Laws of 1939, p. 142, is entitled as follows:

"AN ACT relating to municipally owned street railway or surface transportation systems in cities having more than three hundred thousand population; providing for the borrowing of money from the Reconstruction Finance Corporation or any other agency of the United States government for street railway and surface transportation purposes in such cities, and for the issuance of bonds payable from the revenues of such systems to evidence such loans, the proceeds thereof to be used for the purpose of purchasing and acquiring equipment and extensions, repairs, improvements and betterments to, and the operation of, said systems, and to refund outstanding indebtedness payable from the revenues of said system, to validate all such outstanding indebtedness and to create transportation commissions in such cities, and to prescribe the powers and duties thereof, and to repeal all laws or parts of laws and the provisions of any city charter in conflict herewith in so far as such conflict exists."

The act, as a whole, embodies a new and comprehensive plan for the financing of, and adding to, purchasing, acquiring, constructing, extending, improving, bettering, operating, and maintaining municipally owned street railway or surface transportation systems in cities having a population of over three hundred thousand inhabitants, as well as the purchasing of trolley and motor busses and other equipment, and the extension, repair, improvement, and betterment of the system.

By § 5 of the act, p. 149 (Rem. Rev. Stat. (Sup.), § 9488-10 [P. C. § 1238-9]), there is created in each city affected a "transportation commission"; but such commission cannot transact any business or exercise any of the powers granted to it unless and until three conditions precedent are complied with: (1) the city council, or other governing body thereof, shall so order; (2) the city shall contract a loan from the Reconstruction Finance Corporation, or any other agency of the Federal government; and (3) the city shall provide for the issuance of bonds to evidence such loan.

By § 5, p. 150 (Rem. Rev. Stat. (Sup.), § 9488-10), the transportation commission, when authorized to function, is given the authority, among other things, to:

"(b) Make all rules and regulations governing the operation of the street railway and surface transportation facilities owned and operated by such city, and shall have complete control of all of the employees of said system subject to the civil service provisions of the charter of any such city.

"(c) Have all superintendence, control and management of the facilities, equipment and property now or hereafter used and employed in furnishing surface transportation in such city. . . .

"(e) From time to time determine the type, character and amount of new equipment, extensions, betterments and improvements to such system. . . .

"(g) Control and manage, in accordance with any covenants contained in any ordinance, resolution or other agreement adopted or entered into in connection with the issuance of bonds pursuant to this act and in accordance with the provisions of the charter of any such city to the extent that such charter provisions are not in conflict with such covenants, such street railway and surface transportation system and all revenues derived from the operation thereof, and no moneys shall be withdrawn from the revenues of said system without the approval of said commission, . . ."

The act further provides that such transportation system shall continue in existence, and shall have the powers and perform the duties therein provided, for

so long as any bonds issued pursuant thereto are outstanding and unpaid; and that it shall be complete authority for the issuance of the bonds thereby authorized, and any restrictions, limitations, or regulations relative to the issuance of such bonds contained in any other act shall not apply to the bonds issued under the act; and that the act shall repeal any other act in conflict therewith and shall supersede the provisions of any conflicting city charter. Authority is given to include, in any ordinance or resolution authorizing the issuance of bonds, covenants on the part of the city to protect and safeguard the security and rights of the holders of bonds. One of the covenants enumerated, § 4, p. 147 (Rem. Rev. Stat. (Sup.), § 9488-9(8) [P. C. § 1238-8], is:

"(8) the obligation of any such city to maintain such street railway or surface transportation system in good condition and to operate same in an economical and efficient manner; . . ."

And, finally, by another subdivision of the same section, p. 148:

"(17) such other covenants as may be deemed necessary or desirable to insure a successful and profitable operation of any such street railway or surface transportation system.

"The provisions of this act and of any such ordinance or resolution shall constitute a contract with the holders of such bonds. . . ."

The city of Seattle duly enacted the ordinances necessary to comply with the above-mentioned conditions precedent, and a transportation commission was appointed. One of the ordinances, No. 71031, § 19, contains many covenants, one of which (subd. (a)) is:

"That the city will at all times maintain, preserve, keep and operate or cause to be maintained, preserved, kept and operated, the Transportation System, as added to, improved, bettered and extended, as herein provided for, including all subsequent additions and betterments to or improvements or extensions of said

System, and will, from time to time, make or cause to be made all necessary and proper repairs, renewals and replacements thereof . . . so that the business carried on in connection with the Transportation System will at all times be properly and advantageously conducted in an economical and efficient manner and at reasonable cost, . . . and . . . that all revenues received by the City by virtue of the operation of said System by the City will be paid when and as collected into the Transportation System Revenue Fund provided for in Section 12 of this Ordinance, and that said revenues will be used for no other purpose than the payment of the principal of and interest on indebtedness incurred in connection therewith and for the acquisition, improvement, betterment and extension of the works, plants, facilities, and equipment comprising the Transportation System as now or hereafter constituted, and the proper operation and maintenance of said System, including provision for all necessary repairs, replacements and renewals thereto and working capital necessary for the operation thereof."

A loan was secured from the Reconstruction Finance Corporation. On February 23, 1943, the city, acting by and through its transportation commission, entered into the written contract with the respondent The Austin Company.

The first question we are called upon to consider is that raised by respondent The Austin Company, that the appellant, as a citizen and taxpayer, cannot maintain this action, he not having alleged or proved that he will sustain any special damage as distinguished from the general damage suffered by the public at large. As the judgment is to be affirmed on the merits, we shall not decide the question thus raised, but shall assume, for the purposes of this case, that the appellant has the capacity to maintain the action.

As stated by the appellant, the question before us is: May the Seattle Transit Commission enter into a contract for the construction of an improvement, such as a car barn, involving in excess of two hundred thousand dollars, without advertising and calling for bids? His

contention, as we gather from his briefs and oral argument, is that, by reason of the above-quoted provisions of the Seattle charter, such an addition to, and improvement of, the transportation system as the one involved here may be made, if by contract, only after advertising and calling for competitive bids and such contract is then given to the lowest bidder.

It is not quite clear to us whether the appellant claims that such a contract may be let only by the board of public works, upon competitive bidding, after the commission has designated the type, character, and amount of improvements to be made, or, if the commission does let a contract for improvements, it must follow the charter provisions and advertise and call for bids. However, the main point stressed is that of contracting without advertising or calling for bids. It is argued that the charter provisions requiring advertising and calling for competitive bids lay down a wholesome rule of public policy, and there is nothing in the act of 1939 affirmatively vesting in the transportation commission authority to let contracts for improvements to the transportation system in any other manner, and that it cannot be said that the charter provisions have been superseded or impliedly repealed by this act.

It is a general rule of law that a municipal corporation vested with the authority to construct public works or make improvements to property operated by it, such as a transportation system, may do so either by and through its own officers and agents or by contract; and, if by contract, it is not required to advertise or call for bids or let the contract to the lowest bidder unless there be a constitutional, statutory, or charter provision requiring such a course to be pursued. *Tumwater v. Pix*, 18 Wash. 153, 51 Pac. 353; *Malette v. Spokane*, 77 Wash. 205, 137 Pac. 496, Ann. Cas. 1915D, 225; *Reiter v. Chapman*, 177 Wash. 392, 31 P. (2d) 1005, 92 A. L. R.

828; 44 C. J. 99, § 2185; 3 McQuillin on Corporations (2d ed.), p. 862, § 1288; 43 Am. Jur. 765, §§ 24, 25.

The charter provisions referred to above would apply here if it could be said that the construction of housing facilities for the transportation system is a "public improvement" or the transportation commission contemplates a purchase of supplies, materials, and equipment, unless such charter provisions be superseded by the act in so far as the transportation system is concerned. If the charter provisions do not apply to the addition to the terminal station, then the general rule referred to applies, and the act of the transportation commission in letting the contract to The Austin Company is valid.

█ It is no doubt true that a requirement by the lawmaking body that public contracts be let only after competitive bidding is had, establishes a wholesome rule of public policy, but it is a matter solely within the discretion of that body and, if it does not see fit to establish such a rule in a particular situation, such is not the subject of judicial inquiry even though it may have established such a rule in other similar situations.

There is no requirement in the act that, in any contract the transportation commission may be authorized to enter into, it shall advertise or call for bids or let any contract to the lowest bidder, and there is no constitutional or statutory requirement that such action shall be taken. A very engaging argument is made that, as the act does not affirmatively grant to the transportation commission the power to construct such an improvement as is covered by the contract, but only gives the commission the power to "from time to time determine the type, character and amount of new equipment, extensions, betterments and improvements to such system," and, considering that the existence of the commission is for the period of time the loan from the Reconstruction Finance Corporation is outstanding, it cannot be said that the legislature intended there

should be a change in the rule of public policy set forth in the charter when it did not so affirmatively provide in the act itself. But we believe this is too restricted a view to take when we consider the situation with which the legislature was confronted when framing and passing the legislation.

It was a well-known fact that the transportation system owned and operated by the city of Seattle would presently require the expenditure of substantial sums of money for improvements so that it might render adequate service to the public. It was deemed advisable to take advantage of any opportunity that might be afforded to secure a loan or loans of money from a governmental agency and to repay such a loan out of the revenues derived from the operation of the transportation system. It was known that, in order to secure such a loan, certain rigid requirements would have to be met, which would involve not only the time, manner, and method of repayment, but also a method of operation and management of the transportation system would have to be provided so that the governmental agency would feel justified in making the loan and have the required assurance that the transportation system would have the ability to produce the revenue to repay the loan.

In passing a piece of legislation like that of the act of 1939, it is not always possible or practicable to prescribe in detail all of the acts and things which may be required to be done and performed by the administrative agency set up to carry out and administer the law, or all of the detailed powers which such agency may be required to exercise. Certain duties may be prescribed and certain powers may be expressly granted, and, in order that these may be done and exercised in carrying out the letter and spirit of the law, other powers may have to be exercised in order that the law may be fully operative and the agency function, and, when necessary, certain powers will be implied.

*State ex rel. Hartley v. Clausen,* 150 Wash. 20, 272 Pac. 22; *In re Cashmere State Bank,* 169 Wash. 258, 13 P. (2d) 892.

 The act of 1939 is broad and comprehensive in its terms. Definite objectives are to be obtained in its operation. It is a grant of power to an administrative agency fully and completely to operate, manage, and control a municipally owned transportation system when certain conditions precedent have been complied with. It is not contemplated that there shall be a dual or overlapping authority, between the legally elected or appointed municipal officers and agents and the administrative agency created by the act, if and when such agency commences to function and during the term of its existence. In order to carry out the purposes for which the transportation commission has been created and to comply with the covenants contained in the ordinance authorizing the issuance of bonds, it must be deemed to have the power and authority to enter into contracts to make such additions to, and such improvements of, the transportation system as may be reasonably necessary in its judgment, so that it may properly and efficiently serve the public and preserve and protect its property and equipment.

 The construction of the improvement covered by the contract with The Austin Company is within the power of the transportation commission of the city. The act does not require that competitive bids be called for as a condition precedent for letting a contract. The act supersedes the charter provisions of the city of Seattle relating to competitive bidding, so far as its transportation system is concerned, during such time as the transportation commission shall be authorized to act.

An interesting question has been raised and argued as to whether the addition to the Seattle transportation system covered by the contract with The Austin Company is a "public improvement" within the meaning

of the city charter, the argument being made that the term applies only to the improvements the making of which can result in a tax liability and does not apply when the cost of the improvement is payable solely out of a special fund made up from revenue derived from the operation of a municipally owned public utility. We find it unnecessary to discuss or decide this question at this time, as, in the conclusion we have reached, we can assume without deciding that the improvement in question would be governed by the charter provisions had the act not been passed.

We believe that the two questions we consider unnecessary to be decided should be regarded as immaterial for the purposes of this case, and that, in view of the principal question raised, the case should be decided on its merits.

The judgment is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.

