[No. 4218–2. Division Two. September 13, 1979.]

Manson Construction and Engineering Company, et al, *Respondents*, v. The State of Washington, et al, *Appellants*.

*Slade Gorton, Attorney General, Thomas R. Garlington, Senior Assistant,* and *William G. Boland, Assistant,* for appellants.

*William B. Moore* and *Henry C. Jameson,* for respondents.

Petrie, J.—The State of Washington appeals from portions of an order dated August 8, 1979, which reversed decisions of the Department of Transportation refusing to prequalify the plaintiff contractors as eligible to bid on a contract to construct a temporary replacement floating bridge across Hood Canal. We affirm the order of the trial court.

On February 13, 1979, the western half of the floating bridge built in 1960 across Hood Canal on State Route 104 was demolished during a severe wind storm and unfavorable tidal circumstances. The resultant loss of use of this highway caused harsh economic and transportation problems to a substantial portion of the state. Faced with this sudden and serious emergency, the Department of Transportation devised immediate, interim, and long–range plans to resolve the problem. This case presents a challenge to the procedure by which the department sought to implement its interim plan: to restore use of the highway for a 5–year period by constructing a temporary floating bridge which would connect with the remaining portions of the original structure.

In April, the department's bridge engineer, Mr. C. S. Gloyd, visited several sites at which temporary floating bridges had been constructed by Acrow Corporation of America. The record is replete with indications of the department's satisfaction that Acrow's bridge system works successfully at the several sites for the purposes for which each facility was constructed. One such indication appears in the department's presentation of its plans to a committee of the state legislature on May 9:

> We are fully aware of the Acro [sic] bridge concept at this point in time that will do the job as we understand it, but we are not sure that there aren't possibilities of others and we want to make sure that if there are that the contracting process is handled in a competive [sic] fashion.
>
> . . .
>
> Another important element and one I certainly want to share with you, we believe that we should not, with this temporary bridge, gamble on ideas. We are saying that the contractor must have previously constructed some similar type of bridge so that we can look at it and get some understanding of what it is and of course in the prequalification we would have to be assured that he can provide the guarantee. But, again we do not think it wise with some of the unknowns that we have that we start trying to let somebody bid on ideas. There just isn't time

for us to analyze engineering–wise ideas and frankly there isn't enough time for somebody to spend an awful lot of time engineering new ideas so we are looking for proven performance here on any prospective bidder.

Contract development proceeded with occasional conferences between Acrow personnel and department staff. The record does not reflect that such contract development conferences were conducted with personnel from other potential bidders. At one point, Acrow's representatives expressed "some concerns" with the developing contract specifications and, as reported by department personnel, "suggested some changes they felt were necessary for them to feel comfortable bidding on this contract." Some were adopted; some were rejected.

Bid notices, issued in June, specified that within 300 days of execution of the contract, the successful bidder would be required to design, fabricate, and construct 4,000 feet of floating bridge warranted to survive for 5 years under specified climatic conditions at Hood Canal. Only the most general design requirements were incorporated into the bid specifications, many of which were consistent with components and configurations previously utilized by Acrow at its existing facilities. For example, flotation devices were required to have a minimum depth of 6 feet, and if constructed of steel, a minimum thickness of 4 mm, provided with 3–year cathodic protection. These meet the precise qualities of Acrow's Uniflotes, an essential flotation component Acrow had previously fabricated and erected at other sites.[1]

Although several contractors had expressed an interest in qualifying for the bid, only one was certified as prequalified. Accordingly, on the date set for opening bids only one contractor, Acrow, had submitted a bid.

---

[1] A competent engineer's critical analysis would be necessary to identify all the significant points of similarity. The department's record contains no adversarial hearings, and the contractor's pretrial attempt to take discovery depositions was quashed.

Notice to contractors contained the following prequalification items:

The Department shall certify as prequalified for the construction of the Temporary Hood Canal Bridge, only those firm which have *all* of the following requirements:

1. Adequate financial resources or the ability to secure such resources;
2. *The necessary experience, organization, and technical qualifications to design and construct floating structures.*
3. The ability to comply with the required performance schedule taking into consideration all the firm's existing business commitments.
4. A satisfactory record of performance, integrity, judgment, and skills; and
5. Be otherwise qualified and eligible to design and construct floating structures under applicable laws and regulations.
6. *Can provide evidence of previous successful use by the Contractor of the proposed floating bridge configuration.*
7. Can provide evidence that a warranty secured by an insurance policy will be furnished as specified elsewhere in these project specifications.

(Italics on items 2 and 6 are ours.)

The first five items are mandated by RCW 47.28.070;[2] the seventh item is of no particular concern for purposes of

---

[2]RCW 47.28.070 provides:

"Bid proposals upon any construction or improvement of any state highway shall be made upon contract proposal form supplied by the highway commission, and in no other manner. The highway commission shall, before furnishing any person, firm or corporation desiring to bid upon any work for which a call for bid proposals has been published, with a contract proposal form, require from such person, firm or corporation, answers to questions contained in a standard form of questionnaire and financial statement, including a complete statement of the financial ability and experience of such person, firm, or corporation in performing state highway, road or other public work. Such questionnaire shall be sworn to before a notary public or other person authorized to take acknowledgment of deeds, and shall be submitted once a year and at such other times as the highway commission may require. Whenever the highway commission is not satisfied with the sufficiency of the answers contained in such questionnaire and financial statement or whenever the highway commission determines that such person, firm, or corporation does not meet all of the requirements hereinafter set forth it may

this opinion; but the validity of the sixth item is crucial to this appeal because the department notified three prospective bidders that "Your firm met all of the special requirements except for item 6 . . ."

Accordingly, the department refused to certify those prospective bidders, denying them the right to submit bids on the project. Those three firms (together with a fourth firm, whose status we ignore for purposes of this opinion) filed an action for damages against the State of Washington and also appealed the decisions of the department which refused prequalification certification.

The appeals were heard summarily, pursuant to RCW 47.28.070, in Superior Court for Thurston County. The trial court reversed the decisions of the department and directed the department, "pending further Order of the Court," not to enter into a contract with Acrow pursuant to its bid which was received on August 1, 1979. Nevertheless, the trial court refused to approve or provide any specific method for plaintiffs to enforce their newly acquired right to be recognized as prequalified. The State of Washington appealed to this court; the plaintiffs have filed no cross appeal.

We granted an accelerated hearing, and a panel of this court heard oral argument on the merits of the appeal on

---

refuse to furnish such person, firm or corporation with a contract proposal form and any bid proposal of such person, firm or corporation must be disregarded. In order to obtain a contract proposal form, a person, firm or corporation shall have all of the following requirements:

"(1) Adequate financial resources, or the ability to secure such resources;

"(2) The necessary experience, organization, and technical qualifications to perform the proposed contract;

"(3) The ability to comply with the required performance schedule taking into consideration all of its existing business commitments;

"(4) A satisfactory record of performance, integrity, judgment, and skills; and

"(5) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

"Such refusal shall be conclusive unless appeal therefrom to the superior court of Thurston county be taken within five days, which appeal shall be heard summarily within ten days after the same is taken and on five days' notice thereof to the highway commission."

August 29. On that date the panel orally announced its unanimous decision to affirm the trial court. An expanded explanation of our reasoning follows.

 We begin our analysis of this appeal by reasserting this jurisdiction's strong public policy that, except as permitted by legislation, public contracts shall be let only after competitive bidding procedures have been complied with. *Miller v. State,* 73 Wn.2d 790, 440 P.2d 840 (1968); *Savage v. State,* 75 Wn.2d 618, 453 P.2d 613 (1969). Prequalification standards, as authorized by RCW 47.28.070, tend to limit the extent of competitive bidding. It is the function of the legislature, not the judiciary or an administrative agency, to circumscribe competitive bidding. When, as in the case at bench, the legislature has already defined those limits, courts will be wary of interpreting the legislatively mandated standards so as to further circumscribe the competitive bidding policy. Accordingly, we are not inclined to view favorably an administrative agency's attempt to extend its authority by asserting prequalification standards in excess of those specifically provided by statute.

In its briefs and in oral argument before this court and the trial court, the department has quite clearly expressed its position. Because of the time constraints under which the department was required to implement an effective interim solution to a serious and emergent problem, and because of the necessity to select a solution which has previously demonstrated itself to be safe for public use, the department chose to impose the prequalification requirement that a bidder present evidence that he has previously successfully used the design configuration upon which his bid for construction of the bridge will be based. In other words, the department concluded that it would not have the opportunity to prepare a detailed bridge design and subject that design or the design of a contractor to detailed engineering analysis in time to effectively address the emergency caused by destruction of the Hood Canal Bridge in last February's storm.

Obviously, this court cannot question the department's conclusion as to its own engineering capabilities, particularly when given the time constraints under which the department had to operate. Indeed, superficially at least, the department's determination to seek a reasonably safe interim solution—one which the public can be expected to accept—appears to be laudable, even though the record is clear that no one has successfully used *any* floating bridge configuration under the precise conditions extant at Hood Canal. The legal question presented by this appeal, however, is not whether the department's decision is laudable; rather, the issue is whether that decision can be applied as a prequalification item—thus drastically curtailing the competitive bidding process. We hold that the department, under existing legislation, does not have that authority.

By rejecting prequalification, the department told the three plaintiffs herein in effect: we find that you have all the "necessary experience, organization, and technical qualifications to design and construct floating structures," but, nevertheless, we will not even *consider* your bid because you have not yet successfully used your proposed solution for this project. That was an attempt by an administrative agency to extend its prequalification authority beyond that permitted by statute. The department never considered prequalification item 6 was subsumed under statutory element 2; nor do we. Item 6 was inserted within the bid specifications intentionally and precisely because the department was confronted with an extreme emergency and wanted to avoid having to consider any proposed design not previously shown to have been successfully used, even though the department considered such contractor fully competent by experience, organization, and technical qualifications to design and construct a floating structure. By choosing to so eliminate competent bidders at the prequalification stage, the salutary effect of truly competitive bidding was lost. To that extent, the department committed an error of law. Accordingly, we affirm the trial court's order reversing the department's decisions.

We turn briefly to the plaintiffs' request, despite their failure to cross–appeal, that we exercise authority under RAP 2.4(a)(2) to grant some affirmative relief because it is "demanded by the necessities of the case." In our oral opinion, we announced our decision to refuse to grant affirmative relief, and we do now adhere to that ruling. The State has authority to reject all bids—and it appears that has already occurred. We see no reason to restrict the State in its search for alternative solutions.

Judgment affirmed.

REED, A.C.J., and SOULE, J., concur.

Reconsideration denied October 11, 1979.

Review denied by Supreme Court January 11, 1980.