James R. Ellis Chairman, Board of Directors Washington State Convention Trade Center 701 Fifth Avenue #5000 Seattle, Washington 98104-7078
Dear Chairman Ellis:
By letter previously acknowledged, you have requested our opinion on a question we have paraphrased as follows:
 Where the Legislature has conditioned its financing for expansion of the Washington State Convention Trade Center (WSCTC) on the receipt of a substan tial private financial contribution, necessarily implying a coordinated public-private construction project, and where the Legislature has specifically prohibited the expenditure of public funds for the design of the project until the private contribution has been received, may the joint portions of the project (that is, those structures which support, or are part of, both the expanded Convention Center itself and the associated private development) be lawfully constructed by the private development company without following the detailed statutory requirements applicable to public works?
 BRIEF ANSWER
We answer your question in the affirmative. Although state lawgenerally requires public works to be constructed by public bidafter preparation of detailed plans and specifications, theLegislature has imposed conditions about the WSCTC expansion whichare inconsistent with the design-bid-build process contemplatedby the public works statutes. Therefore, the WSCTC may agree tothe construction of the joint aspects of the expanded structure ina manner inconsistent with public works construction, at least tothe extent necessary to comply with the Legislature'sinstructions.
 BACKGROUND
In 1994 the Legislature appropriated funds and authorized the creation of the Convention Center Expansion and City Facilities Task Force (Task Force) to prepare a feasibility study for expansion of the WSCTC in downtown Seattle. Laws of 1994, Sp. Sess., ch. 6 § 148. The Task Force recommended to the Governor and the Legislature that the WSCTC be expanded, primarily by doubling the size of the exhibit space and building necessary additional support facilities for the new exhibit space. In Laws of 1995, chapter 386, section 12, codified as RCW 67.40.020, the Legislature authorized the expansion project to proceed consistent with the recommendations in a task force report. RCW 67.40.170,-.180. The 1995 Capital Budget authorized the financing for the expansion project. Laws of 1995, 2nd Sp. Sess., ch. 16, § 802(10(b).
RCW 67.40.180 refers to an "expansion development study task force recommendations report dated December 1994." The report in question recommended that the Convention and Trade Center be expanded to the north of its present facility.[1] On October 2, 1996, the Convention Center Board of Directors decided to expand pursuant to the north expansion plan recommended by the Task Force.
Based on the Task Force recommendations, the Legislature required that a part of the funding for the north plan be obtained from non-state public or private sources through a co-development arrangement.[2] As a practical matter, this means that property not needed for the WSCTC expansion itself must be sold to a private developer. However, this property would have little or no value to a private developer, and thus a private contribution could not be obtained, unless the private development could be coordinated with the Convention Center expansion project. The new Convention Center exhibit hall space will be on a single level, across the street from and on the same level as the existing WSCTC exhibit hall space on the fourth floor of the Convention Center. Thus, the primary expansion facilities will be located in a horizontal slice of air, with the floor of the exhibit hall approximately 53 feet above the ground and the roof of the exhibit hall approximately 90 feet above the ground. The exhibit hall facilities would be supported by columns and would occupy one and two-thirds blocks.
Construction of the foundation and under-structure for the exhibit hall will leave considerable space between the street level and the exhibit hall which is not needed for the Convention Center itself and is thus available for some other type of development. Furthermore, applicable zoning allows development up to a maximum height of 300 feet on the site, so the surplus development rights above the exhibit hall roof are considerable. Thus, with coordinated planning, the space below and the space above the new exhibit hall can accommodate other development.
To achieve such co-development, many of the basic building elements, such as the foundation, structure, walls, and roof, must be designed both to support the WSCTC expansion and to meet the needs of the co-developer. For example, the podium structure, rising from the foundation through the exhibit hall roof, will include the WSCTC exhibit hall and supporting structure and facilities. It will also include hotel facilities, such as a lobby, meeting rooms, administrative offices and restaurant, above- and below-grade parking, retail shops, and foundation to support a hotel tower above the exhibit hall. A core, containing elevators and utilities for the tower, will rise through the podium and must be integrated into the exhibit hall in a way that is consistent with the requirements of the Convention Center and of the co-developer.
A primary element of the project will be the shell of the podium. The shell is the superstructure of the podium and consists of the foundation, columns, floors, walls, roof and other structural elements of the podium. The completed shell will have a finished exterior but unfinished interior. This shell is the focus of your question, because it must serve the needs of both the Convention Center and the co-developer. Once the shell is completed, the WSCTC will be responsible for build-out of those portions of the shell which include its expanded space, and the developer will be responsible for the build-out of its own portions.[3] Also, the developer will be solely responsible for the construction of the tower rising from the roof of the podium.
For reasons discussed in more detail below, the WSCTC has, after first conducting a competitive process for selection of a developer,[4] agreed that the shell (that is, the joint portions of the structure) will be constructed by the private developer. Specifically, the developer will design and construct the northwest portion of the shell for a fixed price. Although this decision was made on the basis of legal advice, you have asked for a formal opinion concerning the course of action taken by the Convention Center Board.
In approving the Task Force recommendations, the Legislature required the WSCTC to obtain "an irrevocable commitment of funding from public or private participants" consistent with the Task Force recommendations before making expansion expenditures other than expenditures for "preliminary design and planning activities, environmental studies, and real estate appraisals." RCW 67.40.180. As applied to the usual competitive bidding process for construction projects, the practical effect of this irrevocable commitment requirement is a classic "chicken-and-egg" situation. Generally, in using competitive bidding to select a firm to build a project, the first step is the preparation of construction plans and specifications. These plans and specifications are then used by the bidders as the basis for preparation of bids. Since all the bidders are competing to build the same pre-designed project, a comparison of the bids received is much simplified, and the contract can be awarded primarily on the basis of price. Thus the process is often described as the design-bid-build process.
But here the WSCTC is statutorily precluded from spending funds for the design phase, the preparation of construction plans and specifications, until it has selected a developer and entered into a development agreement that commits the developer to make the irrevocable commitment of funding of at least $7.5 million for the WSCTC portions of the project. Given the large sums of money involved, and the financial risk always associated with capital development, the WSCTC quickly learned that no private developer was willing to make the financial commitment required by RCW67.40.180 without either (1) knowing the detailed design of the project in advance, or (2) having an active and substantial role in planning, designing, and constructing the project. Since the first option was statutorily precluded by RCW 67.40.180 itself, the Convention Center negotiated with developers on the basis of the second option.
To meet the statutory requirement of an irrevocable commitment of private funding before proceeding with the design of the project, the Convention Center, as indicated, has entered into an agreement with a private developer[5] which provides the necessary financial commitments by the developer. The developer was willing to make these commitments, in part, because the developer will be able to undertake the podium construction. This assures the developer of the necessary coordination, allows the developer to better estimate and control its costs, provides the WSCTC with the advantages of a fixed price for a portion of the podium construction, and avoids the need for the Convention Center to undertake construction for a private entity.
Now that a developer has been selected, your question is how to proceed on the joint parts of the project, given the state's public works laws. All of the WSCTC parts of the project other than the shell will be subject to public bidding, and the WSCTC and developer have agreed that the subcontracts for all construction on the shell will be put out to public bid. Thus, the only WSCTC work not subject to public bidding will be the work of the general contractor on the WSCTC part of the shell. In addition, prevailing wages will be paid on all of the construction, and minority and women's business enterprise goals will apply to all WSCTC work.
 ANALYSIS RCW 39.04, as interpreted by case law, generally requires state agencies to use the competitive design-bid-build process for public works projects unless the Legislature has exempted the project or authorized a different public construction process.
Absent the "public-private" elements of the Convention Center expansion, we would find the project subject to RCW 39.04, which pertains, generally, to the construction of public works by state agencies. RCW 39.04.010 defines the terms "state" and "public works" as:
 The term state shall include the state of Washington and all departments, supervisors, commissioners and agencies thereof.
. . .
 The term public work shall include all work, construction, alteration, repair, or improvement other than ordinary maintenance, executed at the cost of the state or of any municipality, or which is by law a lien or charge on any property therein.
The WSCTC is an "instrumentality of the state." RCW 67.40.020. The WSCTC portion of the expansion facility will be constructed for use and acquisition by WSCTC under RCW 39.94, financing contract using certificates of participation.[6] Thus, in AGO 1984 No. 17, written in response to questions about the law governing construction of the original Convention Center structure, we concluded that RCW 39.04 applied to the WSCTC.
The courts have previously interpreted RCW 39.04 as "generally requiring competitive bidding" by state agencies and institutions, and we followed the same analysis as to the WSCTC itself. Id.
at 8. The substantive parts of RCW 39.04 require that competitive bidding be used when a state agency or instrumentality does work by contract, but they allow work do be done other than by contract. This is the way the relevant language reads:
 Whenever the state or any municipality shall determine that any public work is necessary to be done, it shall cause plans, specifications, or both thereof and an estimate of the cost of such work to be made and filed in the office of the director, supervisor, commissioner, trustee, board or agency having by law the authority to require such work to be done. The plans, specifications, and estimates of cost shall be approved by the director, supervisor, commissioner, trustee, board, or agency and the original draft or a certified copy filed in such office before further action is taken.
 If the state or such municipality shall determine that it is necessary or advisable that such work shall be executed by any means or method other than by contract or by a small works roster process, and it shall appear by such estimate that the probable cost of executing such work will exceed the sum of twenty-five thousand dollars, then the state or such municipality shall at least fifteen days before beginning work cause such estimate, together with a description of the work, to be published at least once in a legal newspaper of general circulation published in or as near as possible to that part of the county in which such work is to be done.
RCW 39.040.020 (emphasis added).
The term "contract" is defined in RCW 39.04.010:
 The term contract shall mean a contract in writing for the execution of public work for a fixed or determinable amount duly awarded after advertisement and competitive bid[.]
Despite the indirect and indistinct nature of this language, courts in our state are in favor of competitive bidding on public works projects as a matter of public policy. The provisions of statutes requiring competitive bidding in the letting of public contracts are to:
 prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the . . . [public body] receives the best work or supplies at the most reasonable prices practicable.
Edwards v. Renton, 67 Wn.2d 598, 602, 409 P.2d 153, 157 (1965) (citations omitted). In Manson Const. Eng'r v. State, 24 Wn. App. 185,190, 600 P.2d 643 (1979), the court extended public policy considerably by stating that "we begin our analysis of this appeal by reasserting this jurisdiction's strong public policy that, except as permitted by legislation, public contracts shall be let only after competitive bidding procedures have been complied with." Although the primary purpose for the requirement of public bidding is for the protection of the general public, it is also recognized that another purpose is to provide a fair forum for those interested in undertaking public projects. Gostovich v.West Richland, 75 Wn.2d 583, 587, 452 P.2d 737 (1969).
The courts have, though, recognized limits on the public policy favoring competitive bidding. In Dalton v. Clarke, 18 Wn.2d 322,329, 139 P.2d 291 (1943), the court held that a municipal corporation is not required to award a particular contract through a competitive bidding process unless there is a constitutional, statutory or charter provision requiring that it do so. See also,Petschl v. Century 21 Corp. Inc., 61 Wn.2d 276, 377 P.2d 991
(1963); Shaw Disposal Inc. v. Auburn, 15 Wn. App. 65,546 P.2d 1236 (1976). The Legislature has provided for numerous exemptions from the requirements of competitive bidding.[7] Even where a public bidding requirement would otherwise apply, there is another well-recognized exception: that where the nature or subject of contract is such that competitive proposals would be "undesirable, impracticable or impossible," they may be dispensed with. 10 McQuillin, Municipal Corporations, § 29.38 (3d ed. rev. 1990).[8]
In such cases the statutory requirement is deemed not to apply.See Hiller v. Los Angeles, 197 Cal.App.2d 685,17 Cal.Rptr. 579 (1961) (construction and operation of a zoo by a non-profit corporation was not adaptable to public bidding); Kennedy v. Ross,170 P.2d 904 (1946) (public bidding does not apply where competitive proposals work an incongruity and are unavailing as affecting the final result, or where it is practically impossible to observe such forms). Furthermore, competitive bidding provisions "must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way." 10 McQuillin, Municipal Corporations, § 29.29 (3d ed. rev. 1990).
Thus, the provisions of RCW 39.04 generally require state agencies to use the competitive bidding for public works projects. The Legislature has not, we note, explicitly exempted the expansion project nor authorized a different process requirement. Consequently, in so far as the expansion of the Convention Center involves the construction of a new public-owned structure for a public purpose, we find, again, that the concept of competitive bidding is applicable to the construction of the WSCTC expansion.See AGO 1984 No. 17, at 1. Note, however, our finding that WSCTC does have some "freeboard" in determining the procedure used for competitive bidding. AGO 1984 No. 17, at 12. In the 1984 opinion, this finding was based on the fact that RCW 39.04.010 is not in itself a "full-fledged bid law," being far less explicit, for example, than some of the bid laws governing local governments in Washington. Id. Here, we encounter circumstances justifying the use of some of the "freeboard" in question.
 2. By requiring that the WSCTC have an irrevocable financial commitment from a private party before expending funds for plans and specifications, the Legislature has precluded use of the design-bid-build process.
Under RCW 39.04.020, supra, the first step in the usual competitive bidding process is that the agency file plans, specifications, or both and an estimate of the cost of work to be made before taking further action. The plans and specifications must definitively fix the extent and character of the work to be done and materials to be furnished. Platt Elec. Supply, Inc. v.City of Seattle, 16 Wn. App. 265, 276, 555 P.2d 421 (1976). The specifications inviting bids must be complete, and sufficiently detailed, definite and precise upon all the essential elements that enter into the competitive scheme. Id.
Although the WSCTC is not expressly exempted from the public works bidding requirement in its expansion project, we find an implied exception in the language of RCW 67.40.180, which bars the WSCTC from spending funds to prepare construction plans and specifications until it obtains an irrevocable commitment of funding from a private developer:
 Upon May 16, 1995, the corporation may proceed with preliminary design and planning activities, environmental studies, and real estate appraisals for convention center improvements. No other expenditures may be made in support of the expansion project recommended by the convention center expansion and city facilities task force created under section 148, chapter 6, Laws of 1994 sp. sess. prior to acceptance by the board of directors of the corporation of an irrevocable commitment for funding from public or private participants consistent with the expansion development study task force recommendations report dated December 1994.
RCW 67.40.180 (emphasis added, citations omitted).
The Expansion Development Study Task Force provides that the WSCTC obtain $15 million from a public entity or a private party such as a hotel developer. Thus, RCW 67.40.180 requires the WSCTC Board of Directors to have an irrevocable commitment of $15 million from public or private participants in the expansion project before expending funds for other than preliminary design and planning activities. The City of Seattle has agreed to provide $7.5 million leaving $7.5 million to be obtained from a private developer. The $7.5 million will be contributed to the public costs of the project in exchange for the right to co-develop the project with the WSCTC and obtain the development rights that will be surplus to the WSCTC needs.
If the Legislature had not enacted RCW 67.40.180, the WSCTC could have used a design-bid-build process for the expansion project. Construction plans and specifications could have been prepared for the public parts of the project and the podium shell, and the project could be put out to potential developers for bid. The successful bidder would have been required to commit to pay $7.5 million of the public project costs. But by requiring the WSCTC to enter into a development agreement meeting the $7.5 million irrevocable commitment condition before the WSCTC is authorized to have construction plans and specifications prepared, the Legislature has effectively foreclosed the use of design-bid-build for selecting a developer. Without plans and specifications, potential contractors have no common ground for the submission of bids. This requirement specifically precludes the procedures set forth in RCW 39.04.020.
 3. The practical effect of the irrevocable commitment requires that the developer be responsible for the construction of the shell and other joint structures.
In accordance with RCW 67.40.180, the developer is required to irrevocably commit $7.5 million to the public portions of the North Expansion Alternative. Before entering into a development agreement, a developer must determine that the project is financially feasible with the required $7.5 million commitment. To determine financial feasibility, the developer must establish its costs with reasonable certainty, including the costs of its separate parts of the project and its share of the costs of the joint shell.
The question then arises as to whether the WSCTC may enter into a development agreement that provides for the developer to be responsible for construction of the entire shell, as well as its separate portions of the project. After the WSCTC receives the irrevocable commitment of funding from the developer, it would be theoretically possible for the WSCTC to develop plans sufficient to let a contract for public bidding for a contractor for the WSCTC portions of the shell. However, this approach would result in two general contractors working on the shell. Such an approach would be unnecessarily complex and expensive, given the extreme need for coordination of design and construction activities, and the extensive duplication of expenses. The purpose of competitive bidding is to secure economy in the construction of public works and the practical reality is that the use of a single contractor for construction of the shell is more economical. The increased costs associated with the "two contractor" approach, with its unavoidable duplication of effort, and greatly increased chance of disputes and other legal/financial mishaps, would almost certainly outweigh the economies ordinarily associated with public bidding.
We also reject, as impractical and unlawful, the possibility that the WSCTC would construct the entire project as a public works project, including the developer's portions of the structure. The Legislature has not authorized the WSCTC to build structures specifically intended for use and occupancy by private parties, and nothing in the legislation authorizing the expansion suggests such an option. Although the absence of statutory authority is sufficient reason to reject this alternative, we also note possible constitutional problems (lending of state credit, for example) and serious practical problems (increased chance of contract or tort liability for problems in construction) as well.
Since the WSCTC is not expressly exempted from public bidding, we conclude that the nature of the expansion project as authorized by the Legislature necessarily implies a modification of the public bidding requirements. In addition to the "freeboard" we previously observed in the state public works statute, we note that the WSCTC is a public corporation. Public corporations have those powers granted in express words, and those necessarily and fairly implied or incident thereto or indispensable to its declared objects and purposes. Beasley v. Assets Conservation Co., 131 Wn. 439, 443,230 P. 411 (1924). The WSCTC as a public corporation has power to "have and exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is organized." RCW 24.04.035(20). In addition, WSCTC has the implied powers of a state agency as provided in Tuerk v. Department ofLicensing, 123 Wn.2d 120, 124, 864 P.2d 1382 (1994):
 Administrative agencies have those powers expressly granted to them and those necessarily implied from their statutory delegation of authority. Agencies have implied authority to carry out their legislatively mandated purposes. When a power is granted to an agency, "everything lawful and necessary to the effectual execution of the power" is also granted by implication of law. Likewise, implied authority is found where an agency is charged with a specific duty, but the means of accomplishing that duty are not set forth by the Legislature. Agencies also have implied authority to determine specific factors necessary to meet a legislatively mandated general standard.
(Citations omitted.)
RCW 67.40.180 precludes the use of normal competitive bidding procedures for construction of the shell. The WSCTC has implied authority for the WSCTC to take all actions reasonably necessary to meet the requirements of that statute. Tuerk v. Department ofLicensing, supra. There fore, the WSCTC has implied authority to enter into the development agreement. Further, as dis cussedsupra, competitive bidding provisions should not be applied where they would lead to undesirable or impractical results. 10 McQuillin, Municipal Corporations, §§ 29.29, 29.38 (3d ed. rev. 1990).
For these reasons, we are of the opinion that the WSCTC has the authority to enter into a development contract that provides for the entire shell of the podium structure to be built by the developer, without following the procedural requirements (such as public bidding) included in RCW 39.04. We reach this conclusion, to summarize, based on these factors as discussed above: (1) RCW39.04.010 is not a full-fledged public bid statute, but provides alternative procedures and gives agencies some "freeboard" in some circumstances; (2) RCW 67.40.180 and related budget language make full compliance with RCW 39.04 impossible; (3) the nature of the project renders any other solution uneconomical and impractical. We also note that the WSCTC proposes to build out its own portions of the structure using the statutory public works procedures, so that the public works scheme has been modified only insofar as necessary to meet the practical requirements of the particular project in question. Thus, the WSCTC has chosen a procedure which meets the public policies under the bid requirement, insofar as those policies are not directly contradictory to the legal or practical requirements of the expansion project.
We trust that the foregoing will be of assistance to you.
Very truly yours,
CHRISTINE O. GREGOIRE Attorney General
JAMES K. PHARRIS Senior Assistant Attorney General
[1] The Task Force also considered an alternative (East Alternative), but this was eventually determined not to be financially feasible.
[2] No public entity offered to commit the requisite funding to meet the Legislature's conditions; thus, the WSCTC selected a private entity as its co-developer.
[3] Build-out is a term of art that refers to installation of interior walls, carpeting, paint, lighting, fixtures, heating, ventilation and air conditioning.
[4] The WSCTC advertised for proposals for co-development and evaluated them on the basis of feasibility, harmonization with the WSCTC's own plans, experience with projects of similar magnitude, financial responsibility, and related factors. Although cost could not, by the nature of the project, be the primary basis for selection, the process was designed to be open to all interested parties and to provide an objective basis for a selection.
[5] Option, Purchase and Development Agreement, dated October 2, 1996, between the WSCTC and the R. C. Hedreen Co.
[6] It should be noted that a potential issue exists as to whether construction of a state building financed by means of a financing contract pursuant to RCW 39.94 constitutes a public work because of the structure of such lease-purchase financing. Under such a financing contract, a trustee for purchasers of certificates of participation in the lease payments to be made pursuant to the financing contract is responsible for the construction of the building. The state acquires the building by making lease payments under the financing contract over a period of time. Thus, the proceeds of the sale of certificates of participation to investors are used to pay for construction of the building. SeeDep't of Ecology v. State Finance Comm., 116 Wn.2d 246,804 P.2d 1241 (1991). Because the building is not built at the direct cost of the state, it can be argued that the construction is outside the definition of public works. Given the manner in which we respond to the question presented, it is unnecessary to reach this issue in this opinion.
[7] See inter alia, RCW 39.04.150 (Small Works Roster); RCW 39.10
(Alternative Public Works Contracting Procedures); RCW 36.58
(Solid Waste Disposal); RCW 39.80 (Contracts for Architectural and Engineering Services).
[8] Although the McQuillin treatise applies to municipal rather than state law, it appears consistent with the case law on public works in general, and the principles cited seem equally applicable to state and local government.